Filed 10/10/13; pub. order 11/5/13 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| LATINOS UNIDOS DE NAPA,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>CITY OF NAPA et al.,<br><br>     Defendants and Respondents. | A134959<br><br>(Napa County<br>Super. Ct. No. 26-49634) |

Affordable housing advocates Latinos Unidos de Napa (plaintiff) filed a petition for writ of mandate against the City of Napa (City), its city manager, and its community development director seeking to set aside the City's approval of revisions to the housing element of its general plan, and related general plan and zoning amendments (the Project), on the ground that an environmental impact report (EIR) for the Project is required. The City had concluded the Project would not result in any new significant environmental effects that were not identified and mitigated in its 1998 General Plan Program EIR, and filed a notice of determination to that effect. After the trial court erroneously dismissed plaintiff's petition on statute of limitations grounds, we reversed the judgment in *Latinos Unidos de Napa v. City of Napa.* (2011) 196 Cal.App.4th 1154. The trial court subsequently denied the petition on its merits, agreeing with the City's legal analysis and concluding plaintiff had waived its right to challenge the sufficiency of the evidence. We find no error and affirm.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

### I. *The Parties*

Plaintiff identifies itself as "an unincorporated association which advocates for environmentally sound and legally adequate development policies that address the housing needs of all economic segments of the population in the City of Napa and surrounding areas." The City is the "lead agency" for the subject approvals for the purposes of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] and is charged with duties to disclose, analyze, and mitigate significant impacts from the Project. (§§ 21067, 21165.)

### II. *CEQA*

Under CEQA, an EIR must be prepared before a public agency approves any project that may have a significant effect on the environment. (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 687–688.) CEQA and its related regulations—ordinarily referred to as "Guidelines" (Cal. Code Regs., tit. 14, § 15001 et seq. (Guidelines))—define an EIR as "an informational document" whose purpose "is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project."[2] (Pub. Resources Code, § 21061; Guidelines, § 15003, subds. (b)–(e).)

Public Resources Code section 21166 and Guidelines section 15162[3] mandate that once a public agency has prepared an EIR for a project, no further EIR is required unless either (1) substantial changes are proposed in the project that will require major revisions

---

[1] All subsequent statutory references are to the Public Resources Code except as otherwise indicated.

[2] "The Guidelines are developed by the Office of Planning and Research and adopted by the Secretary of the Resources Agency. [Citations.] 'In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous.' [Citation.]" (*Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 276, fn. 10.)

[3] Guidelines section 15162 implements Public Resources Code section 21166. (See *Benton v. Board of Supervisors* (1991) 226 Cal.App.3d 1467, 1479–1481.)

of the EIR, or (2) substantial changes occur with respect to the circumstances under which the project will be undertaken that will require major revisions in the EIR, or (3) new information, which was not known and could not have been known when the EIR was certified, becomes available.[4]  Additionally, where an agency prepares a "program EIR" for a broad policy document such as a local general plan, Guideline section 15168, subdivision (c)(2) allows agencies to limit future environmental review for later activities that are found to be "within the scope" of the program EIR.

## III.  *The City's General Plan*

The Planning and Zoning Law (Gov. Code, § 65000 et seq.) requires each city and county to "adopt a comprehensive, long-term general plan for the physical development of the county or city, and of any land outside its boundaries which in the planning agency's judgment bears relation to its planning." (Gov. Code, § 65300.)  A city's general plan is its " ' "constitution" for future development' . . . 'located at the top of the hierarchy of local government law regulating land use.' " (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 772–773.)  " '[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements.' [Citations.]" (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 570–571.)  The Planning and Zoning Law requires that each general plan include seven mandatory elements, including a land use element, a circulation element, a housing element, a conservation element, an open-space element, a noise element, and a safety element. (Gov. Code, § 65302.)

State law imposes many requirements for housing elements, including a requirement that they be periodically updated pursuant to a statutory schedule. (Gov. Code, § 65580 et seq.)  The Housing Element Law provides: "The housing element shall consist of an identification and analysis of existing and projected housing needs and a

---

[4]  The Guidelines generally define "new information" as information that shows the project will have new or more severe "significant effects" on the environment not disclosed in the prior EIR. (Guidelines, § 15162, subd. (a).)  A "significant effect" is further defined in the Guidelines as a "substantial, or potentially substantial, adverse change." (Guidelines, § 15382.)

3

statement of goals, policies, quantified objectives, financial resources, and scheduled programs for the preservation, improvement, and development of housing. The housing element shall identify adequate sites for housing, including rental housing, factory-built housing, and mobilehomes, and emergency shelters, and shall make adequate provision for the existing and projected needs of all economic segments of the community." (Gov. Code, § 65583.) The City was required to have adopted updates to its housing element by December 31, 2003 (third revision) and by June 30, 2009 (fourth revision). (Gov. Code, § 65588, subd. (e)(1)(F)).[5]

The City adopted a comprehensive update of its general plan—entitled *Envision Napa 2020*—in December 1998 (2020 General Plan). As its name suggests, the 2020 General Plan sets forth the City's future plans for development through the year 2020. The 2020 General Plan includes updates to all elements of the City's general plan except for the Housing Element, which at the time the City anticipated updating in 2001.

Prior to approving the 2020 General Plan, the City prepared, circulated, and ultimately certified a program EIR (1998 Program EIR). The 1998 Program EIR analyzed the environmental impacts of future projected growth within the City through the year 2020, in accordance with the 2020 General Plan, including analysis of environmental impacts relating to land use, transportation, community services and utilities, cultural resources, visual quality, biological resources, geology, soils, seismicity, hydrology, air quality, noise, and public health and safety. The City updated and/or amended its Housing Element in 2001 and in 2005.

## IV. *The 2009 Housing Element Update Project*

In April 2008, the City began the process of again updating its Housing Element, a course of action that resulted in the Project. This process ultimately included 28 public meetings, including community workshops and other opportunities for public input.

---

[5] Government Code section 65588 has been amended many times, resulting in some shifting of the dates. As of the time the City prepared the 1998 Program EIR, the City considered the third revision due in 2001.

4

On April 20, 2009, City staff prepared an Initial Study to analyze the Project.[6] The Initial Study identified all changes that the Project would make to the existing Housing and Land Use Elements. The Initial Study first summarized the overall policy changes to the Housing Element, including policies to increase housing densities to provide additional housing opportunities, to "maintain and improve neighborhood livability," to "expand community involvement and outreach," to "address housing needs and affordability," and other policy changes to comply with current state requirements.

The Initial Study then further described the specific new actions contemplated by the Project, including: (1) changes to the Land Use Element to increase *the minimum* residential densities in seven areas zoned as "mixed use" or "community commercial" from 10 to 40 residential units per acre to 20 to 40 residential units per acre, (2) changes to the Land Use Element to increase the permitted density for eight multi-family sites located in three areas of the City by a total of 88 units, (3) various zoning amendments to comply with current state laws regarding emergency shelters and transitional, supportive, and farm worker housing, (4) zoning amendments to require a use permit for conversion of certain types of stores and to provide for "co-housing," and (5) Land Use Element and zoning amendments to permit single family detached homes at the same densities of single family attached homes.

The Initial Study then analyzed the extent to which these changes contemplated by the Project could result in any new or different environmental impacts not already analyzed with respect to the 2020 General Plan, specifically and separately analyzing the issues of aesthetics, agricultural resources, air quality, biological resources, cultural resources, geology and soils, greenhouse gas emissions, hazards and hazardous materials, hydrology and water quality, land use and planning, mineral resources, noise, population and housing, public services, recreation, transportation/traffic, and utilities and service systems. Based on its analysis, the Initial Study concluded that the Project was "within

---

[6] An "initial study" is used by an agency to determine whether a project will have a significant effect on the environment under CEQA. (Guidelines, § 15063.)

5

the scope" of the City's 1998 Program EIR, such that the Project required no further environmental review.

On May 22, 2009, the City received a 24-page comment letter from David Graves objecting to the Initial Study and making various arguments that the City should instead prepare a supplemental EIR. The comment letter attached a seven-page letter prepared by traffic engineer Daniel T. Smith, who asserted that the information in the 1998 Program EIR relating to traffic impacts was outdated.

On June 15, 2009, the City's Principal Planner and Public Works Director prepared a 10-page memorandum response to the two letters, disputing the claims made therein. This memorandum included two and a half pages of analysis from the City Public Works Department explaining why it disagreed with the traffic-related comments in the two letters and found them to be "misleading and inaccurate" insofar as they were based on information that was "incorrect and/or incomplete."

On June 17, 2009, the City Council adopted detailed findings restating the Initial Study's determinations summarized above, including findings that the Project was within the scope of the 1998 Program EIR prepared for the 2020 General Plan, and that it would "not result in any new significant environmental effects that were not identified, evaluated and mitigated through [the 1998 Program EIR.]" The council approved the Project, adopting the amendments to the Land Use Element, the updated Housing Element, and, later, approving the various zoning amendments.

## V. The Petition for Writ of Mandate

On October 9, 2009, plaintiff filed a first amended petition for writ of mandate challenging the City's compliance with CEQA in adopting the updated Housing Element and the related conforming changes.[7] As noted above, after the trial court dismissed the action on statute of limitations grounds, we reversed the judgment and the case was returned to the trial court.

---

[7] The present matter pertains to the first cause of action of the first amended petition. The petition originally contained seven causes of action. On June 22, 2010, plaintiff voluntarily dismissed the remaining causes of action.

On February 1, 2012, the trial court issued a tentative ruling denying the petition, finding that the City properly applied section 21166 in determining that the Project was within the scope of the 1998 Program EIR.  The court also found plaintiff had waived its substantial evidence challenges because it "failed to set forth in its opening brief all the evidence which might have a bearing on the administrative decision," and that, even if these challenges were not deemed waived, the City's findings were, in fact, supported by substantial evidence.

On February 21, 2012, the trial court filed its judgment denying plaintiff's petition for the reasons stated in its tentative ruling.  This appeal followed.

## DISCUSSION

### I.  *Standard of Review*

#### A.  *General Standard of Review*

"The standard of review in an action to set aside an agency determination under CEQA is governed by section 21168 in administrative mandamus proceedings, and section 21168.5 in traditional mandamus actions.  The distinction between these two provisions 'is rarely significant.  In either case, the issue before the trial court is whether the agency abused its discretion.  Abuse of discretion is shown if (1) the agency has not proceeded in a manner required by law, or (2) the determination is not supported by substantial evidence.'  [Citations.]"  (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 945.)

#### B.  *"Fair Argument" Versus "Substantial Evidence" Tests*

Relying in part on *Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307 (*Sierra Club*), an opinion authored by this court, plaintiff claims the "fair argument" test applies to the City's decision to refrain from preparing a new EIR because the Project was not adequately covered or mitigated in the 1998 Program EIR.  "The 'fair argument' test is derived from section 21151, which requires an EIR on any project which 'may have a significant effect on the environment.'  That section mandates preparation of an EIR in the first instance 'whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact.'  [Citation.]  If

7

there is substantial evidence of such impact, contrary evidence is not adequate to support a decision to dispense with an EIR." (*Id.* at p. 1316.)  The fair argument standard creates a "low threshold" for requiring an EIR, reflecting a legislative preference for resolving doubts in favor of environmental review.  (*Id*. at pp. 1316–1317.)

The City contends, and the trial court agreed, that the substantial evidence standard of review applies here because the Project falls under section 21166.  "[W]hen a court reviews an agency decision under section 21166 not to require a subsequent or supplemental EIR on a project, the traditional, deferential substantial evidence test applies.  The court decides only whether the administrative record as a whole demonstrates substantial evidence to support the determination that the changes in the project or its circumstances were not so substantial as to require major modifications of the EIR." (*Sierra Club, supra,* 6 Cal.App.4th at p. 1318; accord, *Snarled Traffic Obstructs Progress v. City and County of San Francisco* (1999) 74 Cal.App.4th 793, 800) Thus, "the statutory presumption flips in favor of the [agency] and against further review." (*Moss v. County of Humboldt* (2008) 162 Cal.App.4th 1041, 1049–1050 (*Moss*).)  " '[S]ection 21166 comes into play precisely because in-depth review has already occurred, [and] the time for challenging the sufficiency of the original EIR has long since expired . . . .' " (*Id.* at p. 1050.)

## C.  *Standard of Review Applicable to the City's Environmental Review Process Here*

As the court in Division Three of our appellate district has observed, "[a]lthough the standards for judicial review of an agency's decision under sections 21151 and 21166 are well settled, the issue is not so clear with respect to the agency's decision about *which* of these statutes governs the environmental review process.  Courts have reached different conclusions about the appropriate level of judicial scrutiny to be applied to an agency's determination about whether a project is 'new,' such that section 21151 applies, or whether it is a modification of a previously reviewed project, such that section 21166 applies." (*Moss, supra,* 162 Cal.App.4th at p. 1051.)

In *Save Our Neighborhood v. Lishman* (2006) 140 Cal.App.4th 1288, 1297 (*Save Our Neighborhood*) the Third District Court of Appeal held that this "threshold question"

(*id.* at p. 1301) is a question of law for the court. (*Id.* at p. 1297.) Subsequently, in *Mani Brothers Real Estate Group v. City of Los Angeles* (2007) 153 Cal.App.4th 1385 (*Mani Brothers*), Division Two of the Second District Court of Appeal strongly disagreed with this aspect of *Save Our Neighborhood,* particularly in cases in which there is a previously certified EIR: "Treating the issue as a question of law, as the court did in *Save Our Neighborhood,* inappropriately undermines the deference due the agency in administrative matters. That principle of deference is otherwise honored by the substantial evidence test's resolution of any ' "reasonable doubts in favor of the administrative finding and decision." ' [Citation.]" (*Mani Brothers, supra,* at p. 1401.)

In *Moss,* the appellate court noted these two opposing cases and did not take a direct stand on the issue, finding it unnecessary to do so under the circumstances of that case. (*Moss, supra,* 162 Cal.App.4th at pp. 1052–1053). However, the court did state in a footnote that it agreed with *Mani Brothers* "to the extent its discussion meant to suggest that a court should tread with extraordinary care before reversing a local agency's determination about the environmental impact of changes to a project." (*Moss, supra,* at p. 1052, fn. 6.) We agree with our colleagues in Division Three, and elect to evaluate the City's decision to proceed under section 21166 using the substantial evidence test.[8]

We also observe that the facts of this case are not analogous to the facts at issue in *Sierra Club*. In *Sierra Club,* the county had certified a program EIR for a resource management plan that regulated mining. The plan specified lands available for future mining and provided for preservation of identified agricultural lands. (*Sierra Club, supra*, 6 Cal.App.4th at pp. 1313–1314.) Years later, a mining company proposed to amend the EIR to designate for mining a large parcel that had been identified as agricultural in the EIR. (*Id.* at p. 1314.) We held that the deferential review provided by

---

[8] We note CEQA includes express legislative intent that the courts shall not interpret its provisions or the Guidelines "in a manner which imposes procedural or substantive requirements beyond those explicitly stated" therein. (Pub. Resources Code, § 21083.1.) And the Guidelines also make clear that it is CEQA policy that decisions be "informed and balanced. [CEQA] must not be subverted into an instrument for the oppression and delay of social, economic, or recreational development or advancement." (Guidelines, § 15003, subd. (j); *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 576.)

9

section 21166 did not apply in this context because the proposed project was not "either the same as or within the scope of" the program described in the EIR, which had expressly exempted the agricultural land from future mining. (*Sierra Club, supra,* at p. 1321.) In the present case, the most recent Project is the same as, or within the scope of, that which is described in the 1998 Program EIR. Unlike *Sierra Club* this case does not involve any site-specific plans or any other actual changes to a designated area.

**D. *Substantial Evidence Supports the Decision to Proceed Under Section 21166***

Plaintiff relies on *Center for Sierra Nevada Conservation v. County of El Dorado* (2012) 202 Cal.App.4th 1156 (*County of El Dorado*) in arguing that the Project is not covered by the 1998 Program EIR. In *County of El Dorado,* the county's 2004 general plan and attendant EIR required on-site mitigation of the loss of oak woodland habitat, but anticipated the option of allowing developers to pay a conservation fee under an oak woodland management plan instead. (*Id.* at p. 1165.) Since neither the general plan nor the EIR specified the fee rate or how the collected fees should be used to mitigate the impact on oak woodlands, the appellate court held the county was required to prepare a tiered EIR before it adopted the oak woodland management plan and implemented the fee. (*Id.* at p. 1162.) Plaintiff argues that the Project, like the later approved oak woodland management plan in *County of El Dorado,* was *anticipated* by the 1998 Program EIR, but that the "high density residential units" approved as part of the Project were neither addressed, known, nor adequately covered. We disagree.

Here, the entire Project consists of (1) limited amendments to the Housing Element and the Land Use Element of the 2020 General Plan, and (2) relatively minor amendments to the City's zoning ordinances. In contrast to the facts in *County of El Dorado,* no aspect of the Project involves any approval (site specific or otherwise) of any actual development or other activity. To the extent the Project amends the City's 2020 General Plan, Guidelines section 15162 clearly applies and explicitly requires additional environmental review only for amendments that represent "[s]ubstantial changes . . . proposed in the project which will require *major revisions* of the previous EIR . . . ." (Guidelines, § 15162, subd. (a)(1), italics added.) As to the zoning amendments, those

10

amendments merely incorporate the density revisions already made to the Land Use Element and make other minor changes to comply with current state law. ~(1 AR 369, 33-48)~ Thus, these changes are "within the scope" of the 1998 Program EIR. (See Guidelines, § 15168, subd. (c)(2) ["If the agency finds that pursuant to [Guidelines] Section 15162, no new effects could occur or no new mitigation measures would be required, the agency can approve [a subsequent] activity as being within the scope of the project covered by the program EIR, and no new environmental document would be required."].)

Plaintiff primarily relies upon the fact that, while the City modified every other element of its general plan when it adopted the 2020 General Plan in 1998, it did not change the Housing Element at that time because the City had anticipated updating that element in 2001. Thus, plaintiff asserts that the Housing Element revisions were not a part of the 1998 environmental review and planning process. However, while the City did not change the Housing Element at the time it approved the 2020 General Plan, the 1998 Program EIR analyzed the effects of the then-existing Housing Element. For example, the project description chapter of the 1998 Program EIR summarized all of the general plan goals from each of the elements, including the Housing Element. Thus, the Housing Element was not excluded from consideration.[9] Further, as the City aptly notes, the environmental impacts associated with a community's housing element are necessarily addressed in the land use element. Under Government Code section 65583, the housing element consists of housing-related policies whose site-based objectives must be accounted for in the land use element.[10]

---

[9] An addendum to the final version of the 1998 Program EIR observes: "It should be noted that the housing element update, due in 2001, will provide the City with an opportunity to *refine* the housing numbers based on a systematic review and consideration of the most current information available at that time . . . ." (Italics added.)

[10] Under Government Code section 65302, subdivision (a), a land use element must include "the proposed general distribution and general location and extent of the uses of the land for housing."

11

All of the alleged changes resulting from the Project that plaintiff complains will result in significant impacts—primarily the changes in density—are changes that the Project makes to the Land Use Element, not the Housing Element. There is no dispute that the 2020 General Plan as adopted in 1998 included a fully revised and updated Land Use Element, and there thus can be no dispute that this aspect of the Project clearly is a modification to the 2020 General Plan that was analyzed in the 1998 Program EIR and therefore is properly analyzed under Guidelines section 15162. Thus, substantial evidence supports the City's decision to proceed under Public Resources Code section 21166.

The same standard applies to the amendments to the zoning ordinance: "Once an agency has prepared an EIR, its decision not to prepare a supplemental or subsequent EIR for a later project is reviewed under the deferential substantial evidence standard. [Citations.] 'This rule applies to determinations regarding whether a new EIR is required following a program-EIR level of review.' [Citations.]" (*Citizens for Responsible Equitable Environmental Development v. City of San Diego Redevelopment Agency* (2005) 134 Cal.App.4th 598, 610, fn. omitted.) Accordingly, we conclude the City properly determined that sections 15162 and 15168, subdivision (c) of the Guidelines applied to its CEQA review of the Project.

## II. *Plaintiff Has Failed to Demonstrate That the Decision to Refrain From Preparing an EIR Is Unsupported by Substantial Evidence*

We review the City's conclusion that the Project did not require any further environmental review to determine whether there is substantial evidence to support it. (E.g., *Citizens for a Megaplex-Free Alameda v. City of Alameda* (2007) 149 Cal.App.4th 91, 110 (*Citizens for a Megaplex-Free Alameda* ) [stating that an agency's determination concerning whether to prepare EIR under Pub. Resources Code, § 21166 is reviewed for substantial evidence].) In reviewing an agency's decision not to require additional environmental review "pursuant to section 21166, courts 'are not reviewing the record to determine whether it demonstrates a possibility of environmental impact, but are viewing it in a light most favorable to the [agency's] decision in order to determine whether

12

substantial evidence supports the decision not to require additional review.' [Citation.]"
(*Mani Brothers, supra,* 153 Cal.App.4th at p. 1398.)

As noted above, the Initial Study determined the Project would not create any new or more severe environmental impacts over those analyzed in the 1998 Program EIR. While the Project incrementally raises maximum densities in limited areas of the City, the Initial Study indicates that this will not increase total potential development above what was already analyzed in the 1998 Program EIR. This is largely because "(a) many project approvals have permitted less development than would have been allowed under the applicable 2020 General Plan designations, and (b) the [C]ity's rate of growth has been less than anticipated by the Plan's 1994 projections." The City resultingly concluded that the Project would not require any major revisions to the 1998 Program EIR, was "within the scope" of the 2020 General Plan, and required no further environmental review under CEQA. The trial court found this determination to be supported by substantial evidence.

As a threshold matter, the City contends that because plaintiff, in its opening brief on appeal, failed to fairly summarize the evidence in the administrative record supporting the City's findings, it has waived its right to challenge those findings. For example, the City states that "instead of addressing the City's actual analysis of the impacts of the density changes, [plaintiff] simply asserts that the City did not study it." The City also observes that plaintiff failed to fairly summarize the City Public Works Director's "detailed response" to Smith's traffic report, instead falsely asserting Smith's "expert" evidence is "undisputed."[11] As noted above, the trial court found plaintiff had waived its right to bring a substantial evidence challenge, though it nevertheless reached the merits of plaintiff's substantial evidence contentions.

---

[11] "[S]ubstantial evidence includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact." (§ 21080, subd. (e)(1).) It includes the opinion of a city's "expert planning personnel" on matters within their expertise, even in the absence of "additional evidence or consultation." (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1380.)

13

Plaintiff concedes it was the City that provided detailed evidentiary arguments to the trial court, including citing to specific documents as substantial evidence supporting the City's findings. Plaintiff essentially admits it made no effort to carry its burden, stating: "[C]entral to [plaintiff's] argument, here and in the lower court, is that [the City] abused its discretion by failing to proceed in the manner required by law. [Citation.] That being a legal issue, *judicial review need not reach the issue of whether* [*the City's*] *factual findings are supported by 'substantial evidence.'* " (Italics added.) The obvious flaw with this argument is that we have ruled against plaintiff on the issue of whether the City erred in conducting its environmental review of the Project pursuant to section 21166. In effect, plaintiff thus concedes that, having lost its legal argument, there are no further issues for us to address.

As our colleagues in Division Five have explained, the petitioner bears the burden of demonstrating that the record does not contain sufficient evidence justifying a contested project approval. "To do so, an appellant must set forth in its brief all the material evidence on the point, not merely its own evidence. [Citation.] A failure to do so is deemed a concession that the evidence supports the findings." (*Citizens for a Megaplex-Free Alameda, supra,* 149 Cal.App.4th at pp. 112–113.) The court further stated, " '[I]f the appellants fail to present us with all the relevant evidence, then the appellants *cannot* carry their burden of showing the evidence was insufficient to support the agency's decision because support for that decision may lie in the evidence the appellants ignore.' [Citation.] This failure to present all relevant evidence on the point 'is fatal.' [Citation.] 'A reviewing court will not independently review the record to make up for appellant's failure to carry his burden.' [Citation.]" (*Id.* at p. 113.)

In its reply brief, plaintiff contends that it did cite to relevant evidence supporting the City's findings and claims it has not waived a substantial evidence challenge. Regardless, we agree with the trial court that substantial evidence supports the City's decision not to proceed with any additional environmental review. The 1998 Program EIR analyzed among other things the environmental impacts of land use designations pertaining to housing density, including impacts on traffic, air quality, biological

14

resources, population, public services, and other resources. As noted above, the general plan amendments and zoning changes here at issue increase the *minimum* density of development allowed in certain areas, and allow for 88 potential new units to certain designated locations. Residential density was addressed in the 1998 Program EIR, and the changes made by the Project in narrowing density ranges do not fall outside of the ranges therein discussed.

As to the additional 88 units, the 2020 General Plan anticipated development of slightly more than 300 residential units per year from 1994 to 2020. As of 2009, however, the City had issued about 700 fewer residential building permits for neighboring properties than what was anticipated. In the Initial Study, the City also noted that "many residential projects have developed at less than the maximum than would have been allowed under the applicable 2020 General Plan designations." In light of these facts, plaintiff does not satisfactorily explain how the Project's impacts are so different from, or more severe than, the impacts identified in the 1998 Program EIR so as to require further review. Its assertions that the Project will result in "unmitigated impacts" does not show that the analysis in the EIR is inadequate for the present project, but only hypothesizes that it must be.[12] Even if plaintiff has pointed to contradictory evidence, (Smith's traffic report, for example), it is not our task to weigh this evidence against the evidence relied on by the City. (See *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435.)

---

[12] As a court of law, we lack the resources and the scientific expertise to evaluate the merits of plaintiff's assertions. Thus, we defer to the lead agency's findings in cases involving the substantial evidence standard of review. (See *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393 ["A court's task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated. We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so. Our limited function is consistent with the principle that 'The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations.' [Citation.]"].)

15

### III. *Other Challenges*

Plaintiff claims the substantial evidence standard of review does not apply because the City "failed to comply with CEQA's informational disclosure requirements, such that the decision makers and public could not make a meaningful assessment of potentially significant environmental impacts." Plaintiff goes on to cite to various alleged deficiencies in the Initial Study that, in essence, amount to an attack on the City's decision to refrain from preparing a new EIR.[13] However, as previously discussed, the administrative record contains substantial evidence that the revised project will not cause any new significant impacts. In conclusion, we find no abuse of discretion in City's approval of the Project.[14]

### DISPOSITION

The judgment is affirmed.

_____
Dondero, J.

We concur:


_____
Margulies, Acting P. J.


_____
Banke, J.

_____

[13] For example, plaintiff asserts that the City failed to disclose and analyze the Project's impacts and cumulative impacts to traffic and greenhouse gases, failed to incorporate mitigation measures, geographically segmented the Project's impacts, and failed to provide relevant information and analysis as to how the Project's impacts are offset by the overall reduction in residential housing.

[14] Plaintiff's remaining challenges relating to environmental setting and the statement of overriding considerations are procedurally barred for failure to raise them in the administrative proceedings before the City and because plaintiff did not raise them in the trial court.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| LATINOS UNIDOS DE NAPA,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>CITY OF NAPA et al.,<br><br>     Defendants and Respondents. | A134959<br><br>(Napa County<br>Super. Ct. No. 2649634) |

THE COURT:

     The opinion in the above-entitled matter filed on October 10, 2013, was not certified for publication in the Official Reports. After the court's review of requests under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105, it is hereby ordered that the opinion should be published in the Official Reports.

                         _____

                         Margulies, Acting P. J.

Trial Judge:                         Honorable Francisca P. Tisher

Trial Court:                         Napa County Superior Court


Law Offices of David Grabill, David Grabill; Law Office of Amber Kemble and Amber L. Kemble for Plaintiff and Appellant.

Michael Barrett, City Attorney; Jarvis, Fay, Doporto & Gibson and Rick W. Jarvis for Defendant and Respondent City of Napa.