Filed 2/22/22  Residents for Orcutt Sensible Growth v. County of Santa Barbara
CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| RESIDENTS FOR ORCUTT SENSIBLE GROWTH, et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>COUNTY OF SANTA BARBARA, et al.,<br><br>    Defendants and Respondents,<br><br>MOJO KS2, LLC,<br><br>    Real Party in Interest and Respondent. | 2d Civil No. B311991<br>(Super. Ct. No. 19CV06707)<br>(Santa Barbara County) |

Pursuant to the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.), Residents for Orcutt Sensible Growth and Gina Lord-Garland (appellants) brought an action challenging the approval of a new retail

commercial center in Orcutt, an unincorporated area in the County of Santa Barbara (County). The commercial center is located within the area of the Orcutt Community Plan (OCP). In 1997 respondent County certified a final environmental impact report (the 1997 EIR) for the OCP.

Appellants appeal from a judgment denying their petition for a writ of administrative mandate. (Code Civ. Proc., § 1094.5.) They contend that County erred in approving the commercial center through an addendum instead of requiring a subsequent EIR. In addition, they argue that substantial evidence does not support the addendum's conclusions, that the trial court erroneously augmented the administrative record, and that "the administrative hearing was a sham." (Bold and capitalization omitted.) We affirm.

*Factual and Procedural Background*

The OCP area contains approximately 14,650 acres. The OCP identified "approximately 40 'Key Sites' . . . – sites that were larger than three acres in size and undeveloped or significantly underdeveloped – where the majority of future development in Orcutt would likely take place." "Each Key Site was reviewed individually and as part of the larger comprehensive planning effort . . . ."

One of the reviewed Key Sites was Key Site 2, which consists of 18.2 acres of undeveloped land. This appeal involves a proposed project on a 5.95-acre portion of Key Site 2. The name of the project is the Orcutt Gateway Retail Commercial Center Project ("the Gateway Project"). The developer will construct 42,921 square feet of retail commercial space, including a 28,020 square-foot grocery store; a 2,700 square-foot fast food restaurant; a 6,816 square-foot retail commercial building; and a

2

new gas station with 12 fueling stations, a 4,135 square-foot convenience store, and a 1,250 square-foot carwash. The Gateway Project will provide 184 parking spaces for vehicles, 10 parking spaces for bicycles, and new landscaping.

The 1997 EIR noted that, "[u]nder existing designations, 48 residential units and 82,000 square feet of commercial space could be built" on Key Site 2. Under the OCP, "[t]he proposed land use designation for [Key Site 2] is General Commercial with a zoning district of C-2 [retail commercial] over the entire site." (Bold omitted.) "Under the new [OCP] designations, potential buildout could result in the construction of an estimated 283,500 square feet of commercial space."

For Key Site 2 the 1997 EIR analyzed impacts and imposed mitigation measures in the following areas: geology/soils/flooding, water resources, traffic/circulation, noise, air quality, wastewater, fire protection, solid waste, and visual resources/open space. The 1997 EIR did not discuss impacts to the areas of "Biology, Agricultural Land Conversion[,] and[] Risk of Upset" because "[n]o significant impacts to these resources were identified during initial evaluation of the proposed project."

The 1997 EIR considered three mixed-use alternatives to the proposed commercial land use for Key Site 2. The alternatives were "No Project," "Low Buildout," and "High Buildout." "Under [the Low Buildout alternative], potential development could consist of 243 residential units and 43,649 square feet of commercial space."

In adopting the OCP, the County Board of Supervisors (Board) found: "[Key Site 2] is designated/zoned General Commercial/C-2, with a maximum potential buildout of approximately 283,500 ft² general commercial floor space. . . .

The site's location . . . makes it a key 'gateway' parcel into Orcutt; this location also is excellent for a smaller semi-regional shopping center, provided that development maintains the community's semi-rural character and is designed thoughtfully for neighborhood compatibility." The Board rejected the 1997 EIR's three mixed-use alternatives to the proposed commercial land use.

In August 2016 The Minson Company filed an application for approval of the Gateway Project.[1] Instead of preparing a subsequent EIR, the County Department of Planning and Development prepared an addendum to the 1997 EIR. The addendum explained that a subsequent EIR was unnecessary because "[t]here are no substantial changes to the proposed project which involve[] a new significant environmental effect or a substantial increase in the severity of previously identified significant effect[s]. The project proposes the same uses at a lower density than previously analyzed [in the 1997 EIR], and the analysis contained within the [1997 EIR] addresses the cumulative impacts that would be associated with the proposed project and identifies the mitigation measures that would mitigate those impacts to the extent feasible."

In August 2019 the County Planning Commission accepted the addendum and approved the Gateway Project. Appellants appealed to the Board. The Board denied the appeal, approved

---

[1] MOJO KS2, LLC (MOJO), is the successor in interest to The Minson Company, the original real party in interest and respondent. On November 24, 2021, we granted MOJO's request to substitute into this appeal in place of The Minson Company. MOJO has not filed a separate brief. It joins in County's brief.

the Gateway Project, and "determine[d] that . . . no subsequent Environmental Impact Report shall be prepared for this project . . . ."

Appellants filed a petition for a writ of administrative mandate challenging the Board's decision. The trial court denied the petition and entered judgment in favor of respondents.

*CEQA Law*

"The central purpose of CEQA is to ensure that agencies and the public are adequately informed of the environmental effects of proposed agency action." (*Friends of the College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 951 (*Friends I*).) "Under CEQA and its implementing guidelines,[2] an agency generally conducts an initial study to determine 'if the project may have a significant effect on the environment.' [Citation.] If there is substantial evidence that the project may have a significant effect on the environment, then the agency must prepare and certify an EIR before approving the project." (*Id.* at p. 945.)

"CEQA's subsequent review provisions apply when [as here] an agency modifies a project after it has certified an EIR . . . . [T]hese provisions require the agency to prepare a subsequent EIR or negative declaration under certain circumstances. [Citation.] They also allow the agency to prepare an addendum, rather than a subsequent EIR or negative

---

[2] The CEQA Guidelines (Guidelines) are found in California Code of Regulations, title 14, sections 15000-15387. "These guidelines . . . are 'central to the statutory scheme' . . . . [W]e afford the Guidelines 'great weight' unless a provision is 'clearly unauthorized or erroneous under the statute.' [Citation.]" (*Friends I, supra*, 1 Cal.5th at p. 954.)

declaration, if only 'minor technical changes or additions are necessary or none of the conditions described in [Guidelines] Section 15162 calling for the preparation of a subsequent EIR or negative declaration have occurred.' [Citation.]" (*Friends of the College of San Mateo Gardens v. San Mateo County Community College Dist.* (2017) 11 Cal.App.5th 596, 604, fn. omitted (*Friends II*).)

"CEQA Guidelines section 15162 provides that no subsequent EIR is required either '[w]hen an EIR has [previously] been certified *or* [when] a negative declaration [has previously been] adopted for a project,' unless there are substantial changes to a project or its circumstances that will require major revisions to the existing EIR or negative declaration. [Citations.]"[3] (*Friends I*, *supra*, 1 Cal.5th at pp. 945-

_____

[3] The full text of Guidelines section 15162 is as follows: "(a) When an EIR has been certified or a negative declaration adopted for a project, no subsequent EIR shall be prepared for that project unless the lead agency determines, on the basis of substantial evidence in the light of the whole record, one or more of the following: [¶] (1) Substantial changes are proposed in the project which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; [¶] (2) Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant, environmental effects or a substantial increase in the severity of previously identified significant effects; or [¶] (3) New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete or the negative declaration was adopted, shows any of

6

946, all brackets except last brackets in original.) "[A]n agency that proposes changes to a previously approved project must determine whether the changes are '[s]ubstantial' and 'will require major revisions of the previous EIR . . . due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects.' [Citation.] If the proposed changes meet that standard, then a subsequent or supplemental EIR is required." (*Id*. at p. 950.)

*Standard of Review*

"An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo. [Citations.]" (*Vineyard Area Citizens for Responsible*

---

the following: [¶] (A) The project will have one or more significant effects not discussed in the previous EIR or negative declaration; [¶] (B) Significant effects previously examined will be substantially more severe than shown in the previous EIR; [¶] (C) Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or [¶] (D) Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative."

7

*Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427.)

Where, as here, there is an initial environmental document – the 1997 EIR – the court's first step is to determine "whether [the] initial environmental document remains relevant despite changed plans or circumstances." (*Friends I*, *supra*, 1 Cal.5th at pp. 952-953.) This is "a question for the agency to answer in the first instance, drawing on its particular expertise. [Citation.] A court's task on review is then to decide whether the agency's determination is supported by substantial evidence; the court's job ""is not to weigh conflicting evidence and determine who has the better argument."" [Citation.]" (*Id.* at p. 953.)

"Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (Pub. Res. Code § 21082.2, subd. (c).) "Substantial evidence is evidence of ponderable legal significance, reasonable in nature, credible, and of solid value, evidence that a reasonable mind might accept as adequate to support a conclusion." (*American Canyon Community United for Responsible Growth v. City of American Canyon* (2006) 145 Cal.App.4th 1062, 1070.)

If substantial evidence supports the agency's determination that an initial environmental document remains relevant, the reviewing court's "next - and critical - step is to determine whether the agency has properly determined *how* to comply with its obligations [under CEQA's subsequent review] provisions. In particular, where, as here, the agency has determined that project changes will not require 'major revisions' to its initial environmental document, such that no subsequent or supplemental EIR is required, the reviewing court must then

8

proceed to ask whether substantial evidence supports that determination." (*Friends I*, *supra*, 1 Cal.5th at p. 953.)

"'This deferential standard is a reflection of the fact that in-depth review has already occurred. [Citation.]' [Citation.] 'The burden is on the appellant to show there is no substantial evidence to support the findings of the agency. [Citation.]'" (*Citizens Against Airport Pollution v. City of San Jose* (2014) 227 Cal.App.4th 788, 797-798 (*Citizens Against Airport Pollution*).) "As with all substantial evidence challenges, an appellant challenging an [agency finding] for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking. Failure to do so is fatal. A reviewing court will not independently review the record to make up for appellant's failure to carry his burden." (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266.)

*The "Fair Argument" Standard Is Inapplicable*

Appellants contend that "[t]he Trial Court . . . should reasonably have applied the Fair Argument Standard [of review]." "[W]hen an agency *initially* proposes a project, an EIR is required 'whenever it can be fairly argued on the basis of substantial evidence that [a] project may have significant environmental impact.' [Citations.] Thus, when a reviewing court evaluates an agency's *initial* determination whether to proceed with an EIR, the court's function is 'to determine whether substantial evidence supported the agency's conclusion as to whether the prescribed "fair argument" could be made. If there was substantial evidence that the proposed project might have a significant environmental impact, evidence to the contrary is not sufficient to support a decision to dispense with preparation of an EIR . . . because it could be "fairly argued" that

9

the project might have a significant environmental impact.'" (*Friends I*, 1 Cal.5th at p. 957, italics added.) "The fair argument standard creates a 'low threshold' for requiring an EIR, reflecting a legislative preference for resolving doubts in favor of environmental review." (*Latinos Unidos de Napa v. City of Napa* (2013) 221 Cal.App.4th 192, 200 (*Latinos Unidos de Napa*).)

CEQA's initial review standards do not apply here because the OCP was originally approved by the 1997 EIR. Where "a project was originally approved by an EIR, we affirm the agency's determination whether a subsequent or supplemental EIR is required when the determination is supported by substantial evidence, even if there is other evidence to the contrary." (*Friends II*, *supra*, 11 Cal.App.5th at p. 607; see also *Committee for Re–Evaluation of T–Line Loop v. San Francisco Municipal Transportation Agency* (2016) 6 Cal.App.5th 1237, 1247, 1251-1252; *Latinos Unidos de Napa*, *supra*, 221 Cal.App.4th at p. 200.) Accordingly, the fair argument standard of review is inapplicable.

*The 1997 EIR Is Not a Program EIR as to Key Site 2*

Appellants claim that, as to Key Site 2, the 1997 EIR is a "Program EIR." They argue, "The Program EIR contemplated later environmental review by a 'tiering' document, providing site-specific analysis." "There is absolutely no authority for tiering an addendum off of a Program EIR . . . ." "Instead, Respondents were required to use a Subsequent, Supplemental, or New EIR to tier off the Program EIR. . . ." "By tiering an Addendum off of a 23-year-old Program EIR, Respondents have subverted the environmental review process."

"Under Guidelines section 15168, program EIR's are used for a series of related actions that can be characterized as one large project. If a program EIR is sufficiently comprehensive, the

10

lead agency may dispense with further environmental review for later activities within the program that are adequately covered in the program EIR. (Guidelines, § 15168, subd. (c).) . . . However, '[a] program EIR does not always suffice for a later project. Sometimes a "tiered" EIR [i.e., an EIR that tiers from the program EIR,] is required ([Guidelines,] § 21094) . . . .'" (*Center for Sierra Nevada Conservation v. County of El Dorado* (2012) 202 Cal.App.4th 1156, 1171.) "An agency that chooses to tier may provide analysis of general matters in a broader EIR, then focus on narrower project-specific issues in later EIR's. [Citation.]" (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1173.) "Tiering is appropriate when the sequence of EIRs is: [¶] (a) From a . . . program EIR to a . . . site-specific EIR." (Guidelines § 15385, subd. (a).) "A tiered EIR is required for a later project consistent with the larger program if the project may cause significant environmental effects that were not examined in the prior EIR." (*Save Berkeley's Neighborhoods v. Regents of University of California* (2020) 51 Cal.App.5th 226, 236.)

As to Key Site 2, the 1997 EIR is not a Program EIR. The Board found that, *"[w]ith the exception of the site-specific environmental review performed at varying levels of detail for the 45 selected Key Sites*, [including Key Site 2,] the Environmental Impact Report (EIR) for this project has been prepared as a Program EIR pursuant to CEQA Guidelines Section 15168." (Italics added.) Except for these Key Sites, "the environmental review . . . was done at a program level and is not intended to suffice for project-specific review."

The 1997 EIR noted that the Key Site analyses provided a level of environmental review that was significantly greater than that normally found in a Program EIR: "In order to streamline

11

future permitting and to add a level of certainty to the planning process, the County of Santa Barbara Planning and Development Department established a voluntary, public-private partnership that enabled interested Key Site property owners to receive an *expanded level of environmental review for their property over that normally addressed within the context of a 'program level' community plan EIR.* Key Site owners [including the owner of Key Site 2] participating in this [expanded level of review] program provided limited contributions to assess potential site-specific impacts (e.g. traffic, biology, flooding, etc.) directly related to potential development of their property. Site-specific review for these participating Key Sites include project and alternatives analyses, mitigation measures and CEQA findings for each environmental issue area funded by the property owners." (Italics added.) Key Sites 1, 11, 17, and 18 received more extensive "'mini-EIR's.'" "For Key Sites that did not receive a 'mini-EIR' or that did not participate in the expanded level of review program [in which Key Site 2 participated], . . . [f]uture development proposals . . . will likely require substantial additional CEQA review to analyze potential site-specific issues not addressed in this EIR."

As the trial court observed, appellants' argument that the 1997 EIR was a Program EIR as to Key Site 2 "ignores the fact that Key Site 2 underwent a site-specific analysis." But even if the 1997 EIR were a Program EIR as to Key Site 2, this would not preclude the use of an addendum for the Gateway Project. (See *Citizens Against Airport Pollution, supra,* 227 Cal.App.4th at p. 802 ["even assuming, without deciding, that the 1997 EIR for the Airport Master Plan constitutes a program EIR, . . . we are not persuaded that the proposed changes to the Airport Master

12

Plan that are addressed in the eighth addendum constitute a new project that requires a new EIR"].)

*Substantial Evidence Supports Agency's*
*Finding that the 1997 EIR Remains Relevant*

Appellants assert that the 1997 EIR is "obsolete." They explain, "The Addendum could not have analyzed the impacts caused by the changes to the development with any specificity, particularly given the fact that the . . . [1997] EIR is a 23-year-old document, which at most had only 15 years of efficacy." In support of the alleged 15-year period of efficacy, appellants rely on the following excerpt from the "Executive Summary" of the 1997 EIR: "The [OCP] comprehensively reviews and addresses, through its Goals, Policies, Programs, Actions, and Development Standards, the various geographical and subject matters affecting the continuing function and future development of the Orcutt community over the next 10-15 years. Essentially the Orcutt Community Plan provides a 'blueprint' for the development future of Orcutt."

The above excerpt indicates that the OCP was intended to provide a guide for development over the next 10 to 15 years. It does not detract from the relevance of the 1997 EIR to the present proposed Gateway Project on Key Site 2. Appellants cite no authority to the effect that an EIR becomes stale after the passage of a specified number of years. (See *Mani Brothers Real Estate Group v. City of Los Angeles* (2007) 153 Cal.App.4th 1385, 1399 ["addenda were properly used in cases where many years had elapsed between the original EIR and later project revisions"].)

""A presumption exists that an administrative action was supported by substantial evidence. [Citation.] The burden is on

13

the appellant to show there is no substantial evidence whatsoever to support the findings of the [agency]." . . .'" (*Inyo Citizens for Better Planning v. Inyo County Bd. of Supervisors* (2009) 180 Cal.App.4th 1, 13.) In the addendum the agency found: "[T]he proposed project was anticipated and provided for by the OCP, and the [1997] EIR evaluated, disclosed, and mitigated potentially significant effects to the extent feasible. There have been no substantial unanticipated changes to the project, the project site, the project setting, or circumstances surrounding the project that would require further environmental analysis." Appellants have failed to carry their burden of showing that "there is no substantial evidence whatsoever to support" the agency's finding that the 1997 EIR remains relevant. (*Ibid.*)

*Substantial Evidence Supports Agency's*
*Finding that a Subsequent EIR Is Not Required*

Appellants are required to show that there is no substantial evidence to support the agency's finding that a subsequent EIR is not required. They have not carried their burden: "[t]here are no substantial changes to the proposed project which involve[] a new significant environmental effect or a substantial increase in the severity of previously identified significant effect[s]."

Appellants claim that the Gateway Project involves "major changes, not envisioned until well after the . . . [1997] EIR had been certified." We disagree. The 1997 EIR considered that, "under the new [OCP] designations, potential buildout could result in the construction of an estimated 283,500 square feet of commercial space" on Key Site 2. The Gateway Project's 42,921 square feet of retail commercial space is only 15 percent of the potential commercial buildout of 283,500 square feet. It is less

14

than the 43,649 square feet of commercial space under the 1997 EIR's "Low Buildout" alternative for Key Site 2.

Appellants "do[] not satisfactorily explain how the [Gateway] Project's impacts are so different from, or more severe than, the impacts identified in the 199[7] . . . . EIR so as to require further review." (*Latinos Unidos de Napa, supra,* 221 Cal.App.4th at p. 207.) As the addendum observed, "The [Gateway] project proposes the same uses at a lower density than previously analyzed" in the 1997 EIR.

Appellants argue: "Since 1997 . . . the Project has morphed into a purely commercial development with a smaller footprint." It has "chang[ed] significantly from a mixed-use development to an entirely commercial development with a planned 12-pump gas station and carwash." But the OCP contemplated a purely commercial development on Key Site 2. The 1997 EIR noted that, under the OCP, "[t]he proposed land use designation for [Key Site 2] is General Commercial with a zoning district of C-2 [retail commercial] *over the entire site*." (Bold omitted, italics added.) The Board rejected the 1997 EIR's three mixed-use alternatives to the proposed commercial land use.

The 1997 EIR observed that Key Site 2 would likely be developed as a "neighborhood shopping center" that "would be accompanied by a number of fast food restaurants, gas stations, etc." The Gateway Project is consistent with the 1997 EIR's expected development of Key Site 2.

*Augmentation of Administrative Record*

Appellants maintain that the trial court erroneously augmented the administrative record to include air quality and noise analyses for the Gateway Project. The analyses were prepared in February 2017. The addendum describes them in

detail. Appellants acknowledge: "The addendum purported to incorporate the Analyses by reference, and then purported to rely on the Analyses in making its Findings on Air Quality and Noise. These documents were relevant to the Planning Commission's and Board of Supervisors' decision-making in the Project approvals."

"[O]ur 'review of a trial court's determinations regarding the scope of the administrative record is subject to the principle that appellate courts presume the trial court's order is correct.'" (*Saltonstall v. City of Sacramento* (2015) 234 Cal.App.4th 549, 588.) Appellants have not overcome this presumption.

"The content of administrative records in CEQA proceedings is governed by Public Resources Code section 21167.6 [(section 21167.6)]." (*County of Orange v. Superior Court* (2003) 113 Cal.App.4th 1, 7.) The broad language of section 21167.6, subdivision (e) "contemplates that the administrative record will include pretty much everything that ever came near a proposed development *or* to the agency's compliance with CEQA in responding to that development." (*County of Orange, supra*, at p. 8.) The statutory language encompasses the air quality and noise analyses relied upon in the addendum. "Section 21167.6, subdivision (e) begins with an inclusive view of the record. It states that the record 'shall include' a list of 11 different items, but it is 'not limited to' them." (*Ibid.*) Among the items that "shall" be included are the following: "All written evidence . . . submitted to . . . the respondent public agency with respect to compliance with this division or with respect to the project." (§ 21167.6, subd. (e)(7).) "Any other written materials relevant to the respondent public agency's compliance with this division or to its decision on the merits of the project, including . . . copies of

16

studies or other documents relied upon in any environmental document [such as an addendum] prepared for the project and either made available to the public during the public review period or included in the respondent public agency's files on the project . . . ." (*Id.*, subd. (e)(10).)

The addendum states, "All of the documents incorporated into this Addendum by reference [including the two analyses] are on file with [the Planning and Development Department] and are available [to the public] upon request." In their reply brief appellants claim, "In fact, they [the analyses] were not" available to the public upon request. This conclusionary statement, without explanation and supporting citations to the administrative record, is insufficient. (*Fernandes v. Singh* (2017) 16 Cal.App.5th 932, 942-943.)

Appellants contend that the record should not have been augmented to include the analyses because "[t]here is . . . no evidence in the Record that either of these documents had ever been provided to either the Planning Commission or the Board of Supervisors as part of their decision-making prior to their granting the approvals." But as County notes in its brief, "The plain language of Section 21167.6 . . . does not limit the administrative record only to documents that were actually before decisionmakers at the time of project approval." For all intents and purposes, the analyses were before the Planning Commission and Board because of the addendum's detailed description of the analyses.

*Appellants Have Failed To Show that the*
*Administrative Hearing Was a Sham*

Appellants argue that the administrative hearing was a "sham" because "the County fatally undercut the legitimacy of

17

the Administrative process by withholding from Appellants, and the Public the [two] Analyses on which the ill-conceived Addendum had presumably been grounded, until their *post hoc* Motion to Augment." County did not withhold the analyses from appellants. The analyses were described in the addendum. If appellants wanted to view the analyses, they should have requested them from the Planning and Development Department. Appellants provide no evidence that they made such a request. The trial court observed: "The notice of Public Hearing for the County Planning Commission's August 14, 2019 hearing [on the Gateway Project] specified that 'all documents' could be reviewed at the Department of Planning and Development . . . . [Appellants] were advised of both the existence of the Analyses as well as how to access them. Having not taken advantage of such opportunity, they cannot now be heard to complain that they did not know of their existence." We reject as unfounded appellants' accusation that respondents "conceal[ed] from the public the Analyses."

Appellants further argue that the administrative hearing was a sham because the actual analyses were not provided to the Planning Commission and Board prior to their approval of the Gateway Project. Consequently, their decisions "have been stripped of evidentiary support." But the analyses were summarized in the addendum. Appellants have not cited any authority to the effect that the Planning commissioners and Board members were required to read the actual analyses and could not rely on the summaries in the addendum. The trial court observed that appellants "have identified no code section, regulation, or case law that requires documents to be individually presented to the decision makers."

18

*Disposition*

The judgment is affirmed.  Respondents shall recover their costs on appeal.

NOT TO BE PUBLISHED.


YEGAN, J.

We concur:


GILBERT, P. J.


PERREN, J.

19

James F. Rigali, Judge

Superior Court County of Santa Barbara

_____

Finney Arnold and Tal C. Finney, Shaune B. Arnold; R. Bruce Tepper and R. Bruce Tepper, for Plaintiffs and Appellants.

Brian Pettit, Deputy County Counsel, for Defendants and Respondents.

Fauver Large Archbald & Spray and Marcus J. Kocmur, Olivia K. Marr, for Real Party in Interest and Respondent.