Filed 12/20/16 Certified for Publication 12/22/16 (order and unmodified opn. attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE COMMITTEE FOR RE-EVALUATION OF THE T-LINE LOOP, et al., | A147498 |
| Plaintiffs and Appellants, | |
| v. | (San Francisco County Super. Ct. No. CPF-14-513887) |
| SAN FRANCISCO MUNICIPAL TRANSPORTATION AGENCY, et al., | |
| Defendants and Respondents, | |
| MITCHELL ENGINEERING, | |
| Real Party in Interest. | |

BY THE COURT:

It is ordered that the opinion filed herein on November 29, 2016, be modified as follows:

1. On page 18, the fourth sentence, beginning "In any case," is replaced with: "The Committee does not fairly summarize the evidence in the administrative record that supports the City's decision."

2. On page 18, the text of footnote 16 is replaced with:

"In its reply brief on appeal, the Committee claims that it timely objected to these documents 'being considered as "substantial evidence" for the truth of their contents.' The Committee objected below 'to the "judicial notice" or admissibility

1

or other consideration of the contents, truth, credibility, relevance, interpretation, enforceability and/or legal significance of any of the documents included in the Record of Proceedings.'  In arguing the objection at trial, counsel for the Committee stated, 'while we have no objections to the materials lodged by the City or the materials that were included on our own record obviously, [¶] I did at least want to offer the [objection] to emphasize the point that just because it's in this record does not mean that it's entitled to any particular evidentiary weight.'  The trial court overruled the objection, explaining, 'There is no basis for [the Committee's] request that the Court disregard the entire administrative record.  As in any CEQA action, this Court must evaluate and review the administrative record to determine whether the administrative record reflects compliance with CEQA, and whether the administrative record supports the actions of the agency that approved the project.'  The Committee does not challenge the trial court's evidentiary ruling on appeal."

The petition for rehearing is denied.  This modification does not change the judgment.


Dated: _____          _____
                                                                    Kline, P.J.

Filed 11/29/16 (unmodified version) Certified for Publication 12/22/16 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE COMMITTEE FOR RE-EVALUATION OF THE T-LINE LOOP, et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> SAN FRANCISCO MUNICIPAL TRANSPORTATION AGENCY, et al., <br><br>     Defendants and Respondents, | A147498 <br><br> (San Francisco County Super. Ct. No. CPF-14-513887) |
| MITCHELL ENGINEERING, <br><br>     Real Party in Interest. | |

In 2014, the San Francisco Municipal Transportation Agency (Muni) approved a contract to install the last 900 feet of light rail line needed to complete a partially constructed "Loop" around a city block in the Dogpatch neighborhood of San Francisco.[1] The Loop—bounded by Third, Illinois, 18th and 19th Streets—will allow trains on the T-

---

[1] The administrative record describes the neighborhood: "Dogpatch is the Central Waterfront area of San Francisco, bordering Mission Bay to the north and Potrero Hill to the west. The historic neighborhood contains some of the city's oldest residential and industrial developments, many of which have been rezoned to accommodate a mix of uses. . . . [¶] While some of the industrial and maritime character of the neighborhood remains, the Dogpatch will continue to densify. Developers have been constructing new residential units and offices in the area at a fast pace."

1

Third light rail line to turn around to meet service needs for special events and peak travel periods. Track for the Loop on Third Street was laid more than 10 years ago, and operates as part of the T-Third line; spur track was laid on most of 18th and 19th Streets between Third and Illinois when the T-Third line was constructed. In approving the 2014 contract, Muni authorized the construction of light rail line on Illinois Street and parts of 18th and 19th Streets to connect the existing spurs.

Plaintiffs filed suit to stop construction of the Loop, claiming that Muni failed to comply with CEQA.[2] When Muni's Board of Directors approved the contract to complete the Loop, it relied in part on an environmental impact report that was certified in 1998 (the FEIR, discussed further below) in connection with plans to connect the southeastern portion of San Francisco to the rest of the city. It also relied on statements by the San Francisco Planning Department that no further assessments or environmental impact reports for the project were required under CEQA. On appeal, Plaintiffs the Committee for Re-Evaluation of the T-Line Loop, William Schwartz and Richard Weiner (collectively, the Committee) claim that Muni, the Muni Board of Directors, Muni's Director of Transportation, and the City and County of San Francisco (collectively, the City) abused its discretion under Public Resources Code section 21151 by failing to conduct a new CEQA analysis and instead relying on the 1998 environmental study, which, according to the Committee, did not analyze the Loop. The Committee also claims that even if the 1998 study did analyze the Loop, the City abused its discretion under Public Resources Code section 21166 by not requiring supplemental CEQA analysis examining conditions as they existed in 2014. We conclude that substantial evidence supports the City's determination to proceed under Public Resources Code section 21166 rather than section 21151. We also conclude that substantial evidence supports the City's determination that no further environmental impact report for the Loop was required. Consequently, we find no abuse of discretion, and we will affirm.

_____

[2] The California Environmental Quality Act, Public Resources Code section 21000 et seq.

2

**FACTUAL AND PROCEDURAL BACKGROUND**

A.     *The Third Street Light Rail Project Is Approved*

In the 1990's, Muni's predecessor agency proposed to connect the southeastern part of San Francisco to the rest of the city by means of the Third Street Light Rail Project (the Project), which would link the Visitacion Valley/Little Hollywood and Bayview Hunters Point neighborhoods with Chinatown, Downtown, and South of Market.[3]  The Project was divided into two phases:  the Initial Operating Segment, from the southern border of the city, along Third Street, past the Caltrain Station at King Street to the Embarcadero; and the New Central Subway, from the Caltrain Station at King Street to Chinatown.

In 1998, the San Francisco Planning Department and the Federal Transit Administration published the Third Street Light Rail Project Final Environmental Impact Statement/Final Environmental Impact Report (FEIR) under CEQA and the National Environmental Policy Act (NEPA).[4]  The FEIR discussed both phases of the Project, but at different levels of detail.  The FEIR stated that the two phases were related but distinct, and "subject to separate advancement decisions on separate schedules."  Preliminary engineering had been conducted for the Initial Operating Segment, but not the New Central Subway.  Accordingly, the FEIR evaluated impacts and alternatives for Initial Operating Segment, but provided only "planning-level information with less engineering

---

[3] When the Third Street Light Rail Project was first proposed, the San Francisco Municipal Railway was the project sponsor.  As the result of Proposition E, passed by the voters in November 1999, the San Francisco Municipal Transportation Agency (Muni) was created, consolidating the San Francisco Municipal Railway and the Department of Parking and Traffic.  (https://www.sfmta.com/about-sfmta/our-history-and-fleet/history-sfmta [as of Nov. 29, 2016].)

[4] CEQA calls for the preparation of an environmental impact report (EIR) (Pub. Resources Code, § 21061).  NEPA, 42 United States Code section 4321 et seq., calls for the preparation of an environmental impact statement (EIS).  (See 42 U.S.C. § 4332.)  The FEIR in this case is a "combined NEPA/CEQA document," as authorized under CEQA and NEPA, which provide for cooperation between state and federal agencies in the environmental review of projects, including the preparation of joint documents.  (Pub. Resources Code, §§ 21083.6, 21083.7; 42 U.S.C. § 4332.)

3

detail about the impacts and alternatives" for the New Central Subway, which would be further analyzed in the future.[5]

The FEIR describes the 5.4-mile-long Initial Operating Segment as composed of six smaller segments of light rail line running generally south to north, with Segment 1 beginning near the southern border of San Francisco. Segment 4 runs along Third Street from Kirkwood Avenue north to 16th Street, and includes a "short-turn loop from Third [Street] following 18th, Illinois, and 19th Streets," which would allow the extension of an existing line to serve Mission Bay and provide an area for two 2-car trains to lay over.

The San Francisco Planning Commission certified the FEIR as objective, complete, and in compliance with CEQA and the CEQA Guidelines in December 1998.[6]

B.      *The Initial Operating Segment, Including Part of the Loop, Is Constructed*

Anticipating construction of the Initial Operating Segment, in August 2000 the San Francisco Board of Supervisors (Supervisors) approved a resolution restricting turns and eliminating parking on Third Street. In April 2001, the Supervisors approved a resolution eliminating parking on 18th Street, 19th Street, and Illinois Street, where the Loop was to be constructed.[7]  By 2003, construction of the Initial Operating Segment was

_____

[5] The Central Subway is now under construction and is scheduled to begin service in 2019. (<http://www.centralsubwaysf.com/content/timeline> [as of Nov. 29, 2016].) It is not at issue in this appeal.

[6] The CEQA Guidelines are found in California Code of Regulations, title 14, sections 15000-15387. Our Supreme Court "has not decided ' "whether the Guidelines are regulatory mandates or only aids to interpreting CEQA." ' (*Committee for Green Foothills v. Santa Clara County Board of Supervisors* (2010) 48 Cal.4th 32, 48, fn. 12.)" (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 381, fn. 7.)  "At a minimum, however, courts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2.)

[7] In a footnote, the Committee claims that the City requested judicial notice of this 2001 resolution, and that the request is "<u>subject to **objection**</u>" because the City has "offered no evidence purporting to explain why that action was taken or linking it to the proposed Loop Project." (Bolding and underlining in original.)  Points raised on appeal must be stated under separate headings (Cal. Rules of Court, rule 8.204(a)(1)(B)), and we

4

completed, including Segment 4 along Third Street and much of the Loop.  Loop turnouts from Third Street were built, with track extending two-thirds of the way east from Third Street to Illinois Street on 18th and 19th Streets, but the Loop was not fully completed due to budget constraints.[8]  Construction of the rest of the Loop was deferred because "the bulk of the increased service the Loop was intended to accommodate is not needed until the beginning of the operation of the Central Subway planned for 2019."  The Initial Operating Segment began service as the T-Third Line in 2007.

C.    *Muni Receives a Federal Grant to Complete the Loop*

In 2013, the Federal Transit Administration awarded Muni a $10 million grant under the Transportation Investment Generating Economic Recovery (TIGER) program to fund the completion of the Loop as well as other roadway and surface improvements in the vicinity of Mission Bay.

In connection with applying for the grant, in 2012 Muni prepared a memorandum to the San Francisco Planning Department, seeking the department's concurrence that CEQA Guidelines sections 15162 through 15164 did not require the preparation of a Subsequent EIR, a Supplement to the FEIR, or an Addendum to the FEIR for the Loop to

---

decline to consider this issue, which the Committee raises only in a footnote.  (*Sabi v. Sterling* (2010) 183 Cal.App.4th 916, 947 ["Footnotes are not the appropriate vehicle for stating contentions on appeal."].)  In any event, the resolution is part of the administrative record that was prepared by the Committee and certified by the City.

[8] In a footnote in its reply brief on appeal, the Committee claims there is "no competent or credible evidence to support this 'funding constraint' assertion."  The Committee refers us to its "Objections to Unauthenticated Evidence and Inadmissible Hearsay," filed in the trial court.  The Committee objected below to what it characterized as the City's request for judicial notice of the administrative record, including these documents, but conceded that its objections went to the weight of the evidence rather than the admissibility.  The trial court overruled the objection, explaining that, "There is no basis for [the Committee's] request that the Court disregard the entire administrative record.  As in any CEQA action, this Court must evaluate and review the administrative record to determine whether the administrative record reflects compliance with CEQA, and whether the administrative record supports the actions of the agency that approved the project."  The Committee does not challenge the trial court's evidentiary ruling on appeal.

be completed.  In the memorandum, Muni stated that the environmental impacts of the Loop had been analyzed in the FEIR; there had been no changes to the Loop design since certification of the FEIR; part of the Loop had been built; two new housing developments had been built on 18th Street since certification of the FEIR; several new housing developments had been built along Third Street and in the "near vicinity" since completion of the T-Third Line; and the new residential and commercial developments "were assumed to occur in the area as part of the background growth in the [FEIR] analysis."[9]  Nine days later, the Planning Department responded, "The Project [i.e., the Loop] was evaluated in the [FEIR], certified by the San Francisco Planning Commission on December 3rd, 1998.  No further assessment is required."

On the federal side, to determine whether NEPA required a supplemental environmental impact statement, an environmental assessment of the Loop was conducted to update the analysis in the FEIR.[10]  The Federal Transit Administration reviewed the environmental assessment, as well as comments from the public (including comments from appellants) and responses to those comments, and in July 2013 it issued a "Finding of No Significant Impact," in which it concluded that Muni "incorporated mitigation measures into the project to reduce or eliminate potentially adverse environmental impacts on traffic, air quality, noise and construction."  With this finding,

---

[9] The FEIR anticipated a 39 percent increase in population and a 35 percent increase in employment in the Third Street Corridor by 2015.  "Much of the population and employment growth will result from development in Mission Bay which is projected to include a new University of California campus, research and development functions, over 6,000 dwelling units, a cineplex, a 500-room hotel, and commercial uses.  Other development proposals in the Corridor, such as the new Giants ballpark (Pacific Bell Ballpark), Candlestick Mills Mall and the new 49ers stadium, San Francisco Executive Park development, and Hunter's Point Reuse plan would contribute to this growth."

[10] Under NEPA, an environmental impact statement that is more than five years old generally requires a careful reexamination to determine whether a supplement is needed.  (*Southern Oregon Citizens Against Toxic Sprays, Inc. v. Clark* (9th Cir. 1983) 720 F.2d 1475, 1480 [citing Council on Environmental Quality, *Forty Most Asked Questions Concerning CEQA's National Policy Act Regulation*, 46 Fed.Reg. 18026, 18036 (March 23, 1981)].)

6

the Federal Transit Administration determined that NEPA did not require the preparation of a new environmental impact statement for the Loop. (See 40 C.F.R. §§ 1501.4(e)(1), 1508.13.)

The TIGER grant agreement was signed by Muni and the federal government in August 2013.

D. *Muni Prepares to Complete the Loop*

Once the grant agreement was signed, the project design for the Loop was finalized. In August 2014, Muni prepared another memorandum to the Planning Department about the Loop, asked the Department to review the Loop's "environmental clearance" under CEQA, noting that it had been nearly two years since the Planning Department's October 2012 statement that no further assessment was required. In the memorandum, Muni stated that "[t]he major change in land use plans that has occurred in the vicinity of the Loop since 2012 is the proposal to construct an 18,000 seat arena for the Golden State Warriors basketball team at the northeast corner of 3rd and 16th streets." The memorandum explained that the arena would likely increase demand for transit, and that the Loop would allow increased service in the high-demand area between Market Street and the arena, as well as allowing "storage of light rail transit vehicles just south of the arena prior to the end of arena events for quick response to post-event surges in transit demand." The memorandum stated that storage could be detrimental to traffic flow on southbound Illinois Street, where traffic volumes were generally light, and that storage would likely be minimal during the periods when traffic was heavy. On August 27, 2014, Muni received written confirmation from the Planning Department that the Loop "is still covered by the Third Street Light Rail FEIR. No additional review is necessary."

On September 16, 2014, the Muni Board of Directors adopted a resolution authorizing the execution of a contract for physical construction of the Loop. The resolution describes the Loop as "a project to install trackwork" around a city block "to create a short line loop" for the T-Third Line, that will allow trains to turn around to meet service needs for special events, such as baseball games, and during peak periods. The

7

resolution stated that the Loop "was initially reviewed and analyzed in the [FEIR], which the City certified in 1998; on October 12, 2012, the San Francisco Planning Department determined that no further assessment or supplemental or subsequent EIR was required under [CEQA] for the [Loop] under CEQA Guidelines Sections 15162(a)-(d), Section 15163(a)-(e) and 15164(a)-(e); and on August 27, 2014, the Planning Department further determined that there were no circumstances occurring since October 2012 that would require additional environmental review under the above-referenced CEQA Guidelines. The [Muni] Board relies on the [FEIR], the above mentioned Planning Department determinations, and the administrative record for purpose of the actions set forth in this Resolution; these documents and determinations are incorporated herein by reference."

E.     *The Committee Files a Mandamus Action to Prevent Completion of the Loop*

Ten days later, the Committee filed a Petition for Writ of Mandate and Complaint for Injunctive and Declaratory Relief (Petition) in the superior court, alleging that the City failed to comply with CEQA in approving the Loop.  After the superior court denied the Committee's request for a preliminary injunction preventing physical work on the Loop, the Committee appealed the denial to this court.  (*The Committee for Re-Evaluation of the T-Line Loop, et al. v. San Francisco Municipal Transportation Agency, et al.*, Case No. A144340.)  The Committee filed a petition for writ of supersedeas in that appeal, and requested an immediate stay of construction on the Loop.  We granted the writ petition and issued the requested stay.

While the appeal was pending, the superior court held a trial on the merits of the Petition.  In December 2015 the superior court denied the Petition on the merits, and on January 19, 2016, judgment was entered for the City.  In ruling that the City had complied with CEQA, the superior court concluded that the Loop was included in the Initial Operating Segment that was discussed and analyzed in the FEIR, and that the City did not abuse its discretion in deciding not to prepare a new EIR.  The court concluded that substantial evidence supported the City's decision, and that neither the passage of time from 1998 to 2014, nor additional development in Dogpatch during that period,

8

required a new EIR.  We then dismissed the appeal of the preliminary injunction as moot and dissolved the stay.

The Committee appealed the superior court's denial of the Petition, and filed a new petition for supersedeas and request for a stay in this appeal, which we denied.

## DISCUSSION

The Committee asks us to review the City's determinations that the Loop was reviewed in the FEIR and that further environmental analysis of the Loop was not required under CEQA.

A.     *CEQA Principles and Standards of Judicial Review*

CEQA requires local agencies, such as Muni, to "prepare, or cause to be prepared by contract, and certify the completion of, an [EIR] on any project that they intend to carry out or approve which may have a significant effect on the environment." (Pub. Resources Code, § 21151, subd. (a).)[11]  CEQA requires an agency to prepare an EIR "whenever substantial evidence[12] supports a fair argument that a proposed project 'may have a significant effect on the environment.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123 (*Laurel Heights II*.)  If there is substantial evidence of such an effect, "contrary evidence is not adequate to support a decision to dispense with an EIR." (*Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1316 (*County of Sonoma*).)  "The fair argument standard creates a 'low threshold' for requiring an EIR, reflecting a legislative preference for resolving doubts in favor of environmental review." (*Latinos Unidos de Napa v. City of Napa*

_____

[11] All further unspecified statutory references are to the Public Resources Code.

[12] Under CEQA, substantial evidence is defined to include "fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact" (§ 21080, subd.(e)(1)), and to exclude "argument, speculation, unsubstantiated opinion or narrative, evidence that is clearly inaccurate or erroneous, or evidence of social or economic impacts that do not contribute to, or are not caused by, physical impacts on the environment." (§ 21080, subd. (e)(2).)  " 'Substantial evidence' " is "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (CEQA Guidelines, § 15384, subd. (a).)

9

(2013) 221 Cal.App.4th 192, 200 (*Latinos Unidos*), citing *County of Sonoma*, *supra*, 6 Cal.App.4th at pp. 1316-1317.)

However, once an EIR has been prepared for a project, CEQA prohibits the agency from requiring further EIR's "unless one or more of the following events occurs: [¶] (a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available." (§ 21166.)

When we review the City's determinations here "for compliance with CEQA, we ask whether the agency has prejudicially abused its discretion; such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' ( . . . § 21168.5.) In determining whether there has been an abuse of discretion, we review the agency's action, not the trial court's decision. '[I]n that sense appellate judicial review under CEQA is de novo.' (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 . . . .)" (*Center for Biological Diversity v. California Dept. of Fish and Wildlife* (2015) 62 Cal.4th 204, 214-215 (*Center for Biological Diversity*), fn. omitted.) We determine de novo whether the agency has followed the proper procedures, and we review the agency's substantive factual conclusions for substantial evidence. (*Id.* at p. 215.) In our review, we may not interpret CEQA or the CEQA Guidelines "in a manner which imposes procedural or substantive requirements beyond those explicitly stated." (§ 21083.1.)

In reviewing an agency's decision not to prepare an EIR in the first instance under section 21151, we "must set aside the decision if the administrative record contains substantial evidence that a proposed project might have a significant environmental impact; in such a case, the agency has not proceeded as required by law." (*County of Sonoma*, *supra*, 6 Cal.App.4th at p. 1317.) An agency's decision not to prepare an EIR in

10

the first instance is upheld "only when there is no credible evidence to the contrary." (*Id.* at p. 1318.)

In contrast, we apply a more deferential test to an agency's decision not to prepare a further EIR under section 21166: the agency's decision in that case is upheld if it is supported by substantial evidence in the agency's record. (*Moss v. County of Humboldt* (2008) 162 Cal.App.4th 1041, 1058 (*Moss*); *Citizens for a Megaplex-Free Alameda v. City of Alameda* (2007) 149 Cal.App.4th 91, 110 (*City of Alameda*); see also CEQA Guidelines § 15162 [agency determination to be made "on the basis of substantial evidence in the light of the whole record"]; 2 Kostka & Zischke, Practice under the Cal. Environmental Quality Act (Cont.Ed.Bar 2nd ed. 2008 [March 2016 supp.]) Subsequent and Supplemental EIRs, § 19.55, pp. 19-58 to 19-60.) A party challenging an agency's decision under section 21166 has the burden to demonstrate that the agency's decision is not supported by substantial evidence and is therefore improper. (*Latinos Unidos*, *supra* 221 Cal.App.4th at p. 206.) The court defers to the agency as finder of fact, and indulges all reasonable inferences from the evidence that support the agency's findings, and resolves conflicts in the evidence in favor of the agency's decision. (*Mani Brothers Real Estate Group v. City of Los Angeles* (2007) 153 Cal.App.4th 1385, 1397 (*Mani Brothers*); see also *Latinos Unidos*, *supra*, 221 Cal.App.4th at p. 205.)

Until recently, the law was unclear as to the appropriate level of judicial scrutiny to be applied to an agency's determination whether section 21151 (review in the first instance) or 21166 (subsequent review) applies to a particular project. (*Moss*, *supra*, 162 Cal.App.4th at p. 1051.) Our Supreme Court has now ruled that the substantial evidence standard applies. (*Friends of the College of San Mateo Gardens v. San Mateo Community College Dist.* (2016) 1 Cal.5th 937, 953 (*San Mateo*.) Noting that "[a] decision to proceed under CEQA's subsequent review provisions must . . . necessarily rest on a determination—whether implicit or explicit—that the original environmental document retains some informational value" (*id.* at p. 951), our Supreme Court held that the question "whether an initial environmental document remains relevant . . . is a predominantly factual question. It is thus a question for the agency to answer in the first

instance, drawing on its particular expertise. (*Center for Biological Diversity*[, *supra*,] 62 Cal.4th [at p.] 215.) A court's task on review is then to decide whether the agency's determination is supported by substantial evidence; the court's job ' " 'is not to weigh conflicting evidence and determine who has the better argument.' " ' (*Ibid.*)" (*San Mateo*, *supra*, 1 Cal.5th at pp. 952-953.) As a result, "occasions when a court finds no substantial evidence to support an agency's decision to proceed under CEQA's subsequent review provisions will be rare, and rightly so; 'a court should tread with extraordinary care' before reversing an agency's determination, whether implicit or explicit, that its initial environmental document retains some relevance to the decisionmaking process.' (*Moss*[, *supra*] 162 Cal.App.4th [at p.] 1052, fn. 6.)" (*Id.* at p. 953.)[13]

B.      *Substantial Evidence Supports the Application of Section 21166*
        *to the Loop Project*

The Committee argues that the Loop project described in the 2014 construction contract was not reviewed in the FEIR, and that therefore we must evaluate Muni's decision not to prepare a new EIR under the fair argument standard of section 21151. The City argues that because the Loop project had previously been described and evaluated in the FEIR as part of the Initial Operating Segment, we must evaluate Muni's decision not to prepare a new EIR under the substantial evidence standard of section 21166. The City has the better argument. From our review of the record, we conclude that substantial evidence supports the determination that the Loop project described in the September 2014 resolution was analyzed as part of the Initial Operating Segment as described in the FEIR, and also supports the determination, implicit in the City's decision to proceed under section 21166, that the FEIR retains informational value with respect to the Loop.

_____

        [13] The Supreme Court issued its decision in the *San Mateo* case after briefing in this case was complete. The City directed our attention to the *San Mateo* opinion, and the parties discussed their view of its application to this case at oral argument.

We begin with the language of the FEIR and the 2014 resolution. The FEIR describes the Initial Operating Segment as including "a short-turn loop from Third [Street] following 18th, Illinois, and 19th Streets," and discusses the potential impact of that loop on parking and pedestrians, among other things. The September 2014 resolution describes a light rail project to "install trackwork around the 3d Street/18th Street/Illinois Street/19th Street block to create a short line loop."

We then consider the contents of the FEIR, a document of almost 600 pages, which discusses the Loop exactly where we would expect it to be discussed as part of the Initial Operating Segment. For example, the estimated capital cost of the Loop, described as the "Mission Bay Turnback Facility," is included in the FEIR as part of the estimated cost of the Initial Operating Segment.

Chapter Two of the FEIR describes the alternatives being considered in the report. The Light Rail Alternative consists of two phases, the Initial Operating Segment, discussed in section 2.4.1, and the New Central Subway, discussed in section 2.4.2. The Loop is described in section 2.4.1 of the FEIR, as part of segment 4 of the Initial Operating Segment, which includes "[a] short-turn loop from Third [Street] following 18th, Illinois, and 19th Streets," to allow an existing line, the N-Judah, to be extended to serve Mission Bay, and to provide an area for trains to layover. It is not surprising that the Loop is not mentioned in section 2.4.2 of the FEIR, which describes the New Central Subway. However, section 2.4.2 makes clear that the Loop is part of the Initial Operating Segment, because the New Central Subway operating plan calls for a new line of one-car trains to "provide additional service between Chinatown and Third/Mariposa," which is one block north of the Loop. The new line would "replace the N-line extension into Mission Bay (refer to the IOS operating plan)." The N-line extension was to be made possible by the Loop, hence the reference to the "IOS operating plan." The FEIR acknowledged that the need for the N-line extension would not arise until sometime after the rest of the Initial Operating Segment went into operation.

Chapter Three of the FEIR is a transportation analysis. Section 3.1.5 addresses the availability of parking along the Initial Operating Segment at the time the FEIR was

13

prepared. That section of the FEIR discusses available parking on the streets designated for the Loop as part of segment 4 of the Initial Operating Segment: "[A] 'loop' track is proposed around 18th, Illinois, and 19th Streets. There are eight existing parking spaces on the south side of 19th Street and five spaces on the north side of 18th Street. All of these 13 spaces are usually full during weekdays." Similarly, section 3.2.5 of the FEIR, which addresses impacts on parking from the construction and operation of the Initial Operating Segment, discusses the Loop in connection with the impacts on parking associated with segment 4 of the Initial Operating Segment. The FEIR states that, "[t]he proposed light rail loop track along 19th, Illinois, and 18th Streets would displace all eight parking spaces on the south side of 19th Street and all five spaces on the north side of 18th Street between Third and Illinois Streets. . . . Reserve parking capacity exists on Illinois Street to accommodate displaced vehicles." Section 3.1.6 of the FEIR addresses impacts to pedestrian circulation, and discusses the effect of the Loop on the Bay Trail as part of the Initial Operating Segment: "The Bay Trail follows Illinois Street between Mariposa and 24th Streets. A light rail 'loop' track is proposed around 18th, Illinois, and 19th Streets. The sidewalks on both sides of Illinois Street would be about 4.6 meters (15 feet) wide. Bay Trail users would primarily use the eastern sidewalk, but those on the western sidewalk would cross the light rail tracks twice (at Illinois Street's corners with 18th and 19th Streets). Light rail train velocities around the corners would be slow and the trains would yield to sidewalk traffic, similar to automobiles turning right. No significant impacts would result."

Substantial evidence external to the FEIR also indicates that the Loop is part of the Initial Operating Segment and not part of the Central Subway or an independent project: a significant portion of the Loop, specifically trackwork on 18th and 19th Streets, from Third Street toward Illinois Street, was installed in 2003, during the period of construction for the Initial Operating Segment, which began operation in 2007.

In sum, there is substantial evidence that the Loop described in the September 2014 resolution is the same Loop was that was described in the FEIR as part of the Initial Operating Segment, and that the FEIR, which among other things discussed the Loop's

14

effects on parking and pedestrians and the interrelationship between projected growth in population and employment in the southeastern part of San Francisco and the operation of the Loop, retained informational value.  In light of this substantial evidence, it was not an abuse of discretion to proceed under section 21166 rather than section 21151.

The Committee, however, contends that to the extent the Loop is discussed in the FEIR, it is not discussed as part of the Initial Operating Segment, but rather as part of the New Central Subway phase of the Project, which was not fully analyzed in the FEIR.  The only support the Committee offers for this claim is this:  in the FEIR, a diagram of the Initial Operating Segment makes no reference to the Loop, while a diagram of the New Central Subway indicates the Loop as a "light rail short-turn."[14]  The Committee's claim lacks merit.  The Committee does not identify any portion of the text or tables in the FEIR where the Loop is discussed as part of the New Central Subway, and our review of the record has revealed none.  Furthermore, in 2008, a Supplemental Environmental Impact Statement/Supplemental Environmental Impact Report (SEIR) was prepared for the Central Subway portion of the Project.  Nothing in the SEIR indicates that the Loop is or was viewed as part of the Central Subway project, which is to provide service "from the present terminus of the T-Third Line at Fourth and King Streets through South of Market, Downtown and Chinatown in the Central Subway Corridor."  Indeed, the parties agree that the SEIR does not analyze the Loop.  And trackwork for the Loop was installed on 18th and 19th Streets in 2003, years before the Central Subway SEIR was prepared.

The Committee also argues that even if the FEIR discussed the Loop as part of the Initial Operating Segment, the FEIR did not provide a detailed, CEQA-compliant analysis of the Loop.  This argument amounts to an untimely challenge of the FEIR, which was certified in 1998.  Under section 21167.2, an EIR is conclusively presumed

---

[14] The City explains the absence of the notation for the Loop in the Initial Operating Segment figure as a "graphic design issue," claiming that "the notation would likely be covered up" by the legend for the figure, which is larger than the legend for the New Central Subway figure.

15

valid unless a lawsuit has been timely brought to contest its validity, which no one contends to have happened here. "This presumption acts to preclude reopening of the CEQA process even if the initial EIR is discovered to have been fundamentally inaccurate and misleading in the description of a significant effect or the severity of its consequences. After certification, the interests of finality are favored over the policy of encouraging public comment." (*Laurel Heights II*, *supra*, 6 Cal.4th at p. 1130.)

C.      *Substantial Evidence Supports the Decision under Section 21166*
        *Not to Prepare a New EIR for the Loop in 2014*

        1.      *Applicable Law*

It is well-established that under section 21166 we apply the deferential substantial evidence test in reviewing the determination that no further CEQA review was required for the Loop. (*San Mateo*, *supra*, 1 Cal.5th at p. 944; *Moss*, *supra*, 162 Cal.App.4th at p. 1058.) Despite this, the Committee argues we should use the fair argument test, resolve all doubts in favor of environmental review, and set aside the City's decision if the administrative record contains substantial evidence that a proposed project might have a significant environmental impact. The Committee's argument is meritless.

The Committee relies on inapposite quotations from *Sierra Club v. County of San Diego* (2014) 231 Cal.App.4th 1152, 1164 (*County of San Diego*) and *County of Sonoma*, *supra*, 6 Cal.App.4th 1317-1319 for the proposition that it is a question of law, subject to de novo review, whether the City's "decision not to prepare any new second tier or supplemental CEQA analysis before approving the [Loop] was justified, or whether there was evidence raising a 'fair argument' that the [Loop] might arguably have environmental impacts that were not examined in the [FEIR]." The quotations are inapposite because they concern the judicial standard of review under sections of the Public Resources Code other than section 21166. Some are drawn from a discussion of the judicial standard of review under section 21151. (*County of Sonoma*, *supra*, 6 Cal.App.4th at pp. 1317-1318 ["A court reviewing an agency's decision not to prepare an EIR *in the first instance* must set aside the decision if the administrative record contains substantial evidence that a proposed project might have a significant environmental

16

impact. . . . Stated another way, the question is one of law, i.e., 'the sufficiency of the evidence to support a fair argument.' " (Emphasis added.)].) Others are drawn from a discussion of the judicial standard of review under section 21094, which applies when "a prior environmental impact report has been prepared and certified for a program, plan, policy, or ordinance." (§ 21094, subd. (a); (*County of San Diego*, *supra*, 231 Cal.App.4th at p. 1164 ["when *a prior EIR has been prepared and certified for a program or plan*, the question for a court reviewing an agency's decision not to use a tiered EIR for a later project 'is one of law . . . .' " (Emphasis added.)]; *County of Sonoma*, *supra*, 6 Cal.App.4th at p. 1319 ["if there is substantial evidence in the record that the later project may arguably have a significant adverse effect on the environment which was not examined in the prior *program* EIR, doubts must be resolved in favor of environmental review and the agency must prepare a new tiered EIR, notwithstanding the existence of contrary evidence" (emphasis added)].)

The FEIR is not a program or plan EIR with respect to the Initial Operating Segment or the Loop: it is a project-level EIR that evaluated impacts and alternatives. A project-level EIR is prepared for a particular project, and examines site-specific considerations in detail, including planning, construction and operation (*Town of Atherton v. California High-Speed Rail Authority* (2014) 228 Cal.App.4th 314, 344; CEQA Guidelines, § 15161), which is exactly what the FEIR examined for the Initial Operating Segment, including the Loop.[15] We therefore apply the section 21166 substantial evidence standard here. (*Moss*, *supra*, 162 Cal.App.4th at p. 1058.)

---

[15] In contrast, a program EIR is prepared for a series of related "actions that can be characterized as one large project." (CEQA Guidelines, § 15168, subd. (a).) "Subsequent activities in the program must be examined in the light of the program EIR to determine whether an additional environmental document must be prepared." (CEQA Guidelines, § 15168, subd. (c).) In *County of San Diego*, the Court of Appeal concluded that the county was required to prepare a supplemental EIR for a later project, because there was no substantial evidence in the record to support the county's conclusion that the later project was within the scope of the previously certified program EIR. (*County of San Diego*, *supra*, 231 Cal.App.4th at p. 1174.)

2.	*Analysis*

The Committee has the burden to show an absence of substantial evidence supporting Muni's 2014 decision not to prepare a further EIR.  (*Latinos Unidos*, *supra*, 221 Cal.App.4th at p. 206.)  The Committee contends that there is "<u>no</u> evidence, 'substantial' or otherwise" to support Muni's refusal to prepare a supplemental EIR.  We disagree.  In any case, because the Committee disregards the evidence in the record that supports the City's decision, the Committee has failed to meet its burden.  (*City of Alameda*, *supra*, 149 Cal.App.4th at pp. 112-113; see also *Mani Brothers*, *supra*, 153 Cal.App.4th at p. 1402 ["As with all substantial evidence issues, an appellant challenging the evidence must lay out the evidence favorable to the other side and show why it is lacking"].)

The 2012 and 2014 statements from the Planning Department that the Loop had been analyzed in the FEIR and that no further CEQA analysis was needed, and the memoranda from Muni to which those statements respond constitute substantial evidence that there were no substantial changes proposed to the Loop project that was analyzed in the FEIR and no substantial changes in the area that would require major revisions to the FEIR or the preparation of further environmental impact reports.[16]  (§ 21166, subds. (a) & (b); CEQA Guidelines, §§ 15162, 15163, 15164.)

On two separate occasions, the Planning Department responded to memoranda from Muni by writing that the Loop had been evaluated in the FEIR and that no further

_____

[16] In its reply brief on appeal, the Committee claims that it timely objected to these documents "being considered as 'substantial evidence' for the truth of their contents."  The Committee objected below to what it characterized as the City's request for judicial notice of the administrative record, including these documents, but conceded that its objections went to the weight of the evidence rather than the admissibility.  The trial court overruled the objection, explaining that, "There is no basis for [the Committee's] request that the Court disregard the entire administrative record.  As in any CEQA action, this Court must evaluate and review the administrative record to determine whether the administrative record reflects compliance with CEQA, and whether the administrative record supports the actions of the agency that approved the project."  The Committee does not challenge the trial court's evidentiary ruling on appeal.

18

assessment under CEQA is required. Both memoranda describe the Loop in the same terms as it was described in the FEIR, and the 2012 memorandum states that there have been no changes to the Loop design since the FEIR certification. The memoranda therefore constitute substantial evidence that the project had not been changed. (§ 21166, subd. (a); CEQA Guidelines, § 15162, subd. (a)(1).) The memoranda also constitute substantial evidence that there have not been changes in the circumstances under which the Loop would be constructed that would lead to new significant environmental effects or an increase in the severity of previously identified effects. (§ 21166, subd. (b); CEQA Guidelines, § 15162, subd. (a)(2).) The memoranda describe the changes in the area of the Loop since the FEIR was certified, including the completion of two housing developments and a proposal to construct an arena for the Golden State Warriors nearby. The FEIR assumed extensive new residential and commercial developments in the area and analyzed the impacts of constructing and operating light rail in residential areas, including the area of the Loop.

The 2013 environmental assessment, which resulted in a finding of no significant impact by the Federal Transit Administration, provides further evidentiary support for the decision not to prepare a new EIR for the Loop, including support that new information does not show new significant effects or more severe significant effects, or reveal any new or different mitigation measures that would reduce significant effects but that the City refuses to adopt. (§ 21166, subd. (c); CEQA Guidelines, § 15162, subd. (a)(3).) The environmental assessment evaluated the construction and operation of the Loop with respect to aesthetics, air quality, climate change, environmental justice, historic and archaeological preservation, land use, noise and vibration, parks and recreation areas, safety and security, transportation, and cumulative effects, and concluded as follows: no adverse effects on aesthetic resources; no adverse effects on air quality, with the implementation of best management practices recommended by the Bay Area Air Quality Management District; no adverse effect on greenhouse gas emissions during operation, and only temporary and insignificant contributions to greenhouse gas emissions during construction; no adverse effects to historic properties, so long as specified procedures are

19

followed in connection with ground-disturbing activities; no substantial change to the existing character or land uses of the site and vicinity;[17] no adverse noise or vibration effects from operation and, with the implementation of certain best management practices, no adverse noise or vibration effects from construction; no adverse effects to recreation resources; no adverse effects to safety and security; no adverse effect on transportation including parking; and no disproportionate adverse effect on minority or low-income populations.

The Committee identifies just one substantial change in the Loop that could require a subsequent or supplemental EIR under section 21166, subdivision (a): the Committee claims that the decision to defer construction of the Loop constituted a change to the project after the spur tracks on 18th and 19th Streets were built in 2003. But the Committee does not cite any authority holding that mere delay in completing construction constitutes a substantial change in a project under section 21166. Rather, the Committee cites two CEQA cases that involved not only delays in construction, but also major changes to project design. (*Ventura Foothill Neighbors v. County of Ventura* (2014) 232 Cal.App.4th 429, 431-432 [changing height and location of building after passage of more than 10 years] and *Concerned Citizens of Costa Mesa v. 32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 934-935 [expanding the size of an amphitheater from six to 10 acres, expanding capacity from 5,000 fixed seats to 7,000, and reorienting the stage, after passage of about two years].) The Committee also cites a case decided under the Hawaii Environmental Policy Act and the Hawaii Administrative Regulations, which, unlike CEQA and the CEQA Guidelines, specify that the timing of an action is to be considered in determining whether to require a supplemental environmental impact statement. (*Unite Here! Local 5 v. City and County of Honolulu* (Hawaii 2010) 231 P.3d 423, 450.)

---

[17] The environmental assessment noted that the construction and operation of the Loop "is consistent with the city's ordinances, regulations, plans, and policies concerning land use and would be consistent with regional transportation and development plans."

The Committee claims that the City disregarded substantial evidence showing "changed circumstances, changes to the Loop Project itself, and new information of environmental significance" that raised a fair argument that the Loop could not been approved without further CEQA review under section 21166 and CEQA Guidelines sections 15162 through 15164. Here again, the Committee disregards the standard of review under section 21166: the question is not whether substantial evidence would support a different decision from the one the agency made; the question is whether the agency's decision is supported by substantial evidence. (See *Latinos Unidos*, *supra*, 221 Cal.App.4th at p. 206.) The Committee does not even discuss its own "substantial evidence" in any depth, but simply refers us to various documents and pages in the record. For example, the Committee claims that the "Dogpatch Neighborhood Parking Background Report" prepared by Muni in November 2013, constitutes substantial evidence of changed circumstances in the area of the Loop and new information of environmental significance because the report study recognizes "significant changes in the project area."[18] But changes in a neighborhood do not constitute a change in circumstances that requires a new EIR under section 21166, unless the changes require "major revisions" to an existing EIR. (§ 21166, subd. (a); see also CEQA Guidelines, § 15162, subd. (a)(2).) Here, however, the FEIR anticipated an increase in residential use and other development and analyzed the impacts of constructing and operating light rail in residential areas, including the area of the Loop. Among other things, the FEIR addressed the environmental effects of which the Committee complains: noise and vibration, dust, air quality, parking, and roadway capacity.

Similarly, new information does not require a new EIR unless it shows effects that were not addressed in the previous EIR or effects that would be "substantially more

---

[18] The streets where the Loop is to be constructed are on the eastern border of the northern portion of the Dogpatch parking study area. The study area covered about 25 square blocks of various sizes, and included Third Street between 18th and 19th Streets, where the T-Third line was already operating by 2013, and 18th and 19th Streets between Third and Illinois Streets.

21

severe" than those addressed, or shows that the agency refuses to adopt certain new or feasible mitigation measures or alternatives. (CEQA Guidelines, § 15162, subd. (a)(3).) The Committee makes no such showing. Rather, the Committee asserts that the City "admit[s] that the Loop Project contract does <u>not</u> include any specific mitigation measures," citing to an email from Muni to the Committee's attorney in which Muni responds to a public records request. The apparent omission from the record of the Committee's request renders the email uninformative. Besides, the contract includes more than 20 pages that detail the "environmental mitigation measures and temporary controls" required for construction.

The Committee argues that the City abused its discretion by failing to follow required procedures in making its determination that no further CEQA analysis was necessary. The Committee contends that Muni relied on only "an unsupported staff conclusion" that no further CEQA review was necessary, and that Muni failed to make the required "public, evidence-based, analysis and determination." These are not procedural flaws, because CEQA does not set forth any particular procedure to support an agency's decision that a new EIR is not required. CEQA does not require an initial study or public hearing in these circumstances.[19] (*A Local and Regional Monitor v. City of Los Angeles* (1993) 12 Cal.App.4th 1773, 1804-1806.) At any rate, the record shows that that Muni relied on more than just a staff conclusion in determining that no further CEQA review was necessary, and also shows that there was support for the staff conclusions on which Muni relied. Moreover, the environmental assessment prepared under NEPA is approximately equivalent to an initial study under CEQA. (CEQA Guidelines, § 15063, subd. (a)(2) [an "agency may use an environmental assessment or a similar analysis prepared pursuant to [NEPA]" to meet a requirement to conduct an initial study].) The

---

[19] An agency conducts an initial study to determine whether a project may have a significant effect on the environment. (CEQA Guidelines, § 15063, subd. (a).) When an initial study shows that a project may have a significant effect on the environment, an EIR is usually required, but if the project is revised to eliminate or avoid significant effects on the environment by incorporating mitigation measures, an agency may adopt a mitigated negative declaration. (CEQA Guidelines, § 15064, subd. (f)(2).)

record shows that the 2013 environmental assessment here was made available to the public, and the Committee even commented on it. Also, the Board of Supervisors' Land Use and Economic Development Committee held a public hearing on the status of the Loop in July 2014, at which the Committee appeared and made comments.

We conclude that substantial evidence supports the City's decision in September 2014 not to undertake further CEQA analysis of the Loop; the Committee has not met its burden to show otherwise.

## DISPOSITION

The judgment is affirmed. The City shall recover its costs on appeal.

_____

Miller, J.

We concur:


_____

Kline, P.J.


_____

Richman, J.


A147498, *Committee for Re-Evaluation of the T-Line Loop, et al. v. SFMTA, et al.*

24

Filed 12/22/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE COMMITTEE FOR RE-EVALUATION OF THE T-LINE LOOP, et al.,<br><br>      Plaintiffs and Appellants,<br><br>v.<br><br>SAN FRANCISCO MUNICIPAL TRANSPORTATION AGENCY, et al.,<br><br>      Defendants and Respondents,<br><br>MITCHELL ENGINEERING,<br><br>      Real Party in Interest. | A147498<br><br>(San Francisco County<br>Super. Ct. No. CPF-14-513887) |

BY THE COURT:

The opinion in the above-entitled matter filed on November 29, 2016, was not certified for publication in the Official Reports. For good cause and pursuant to California Rules of Court, rule 8.1105, it now appears that the opinion should be published in the Official Reports, and it is so ordered.

Dated: _____       _____

                                                                    Kline, P.J.

Trial Court:  Superior Court of San Francisco

Trial Judge:  Hon. Garrett Wong


Attorney for Appellants                          David P. Lanferman


Attorneys for Respondents                        Dennis J. Herrera
                                                 City Attorney
                                                 James M. Emery
                                                 Audrey W. Pearson
                                                 Andrea Ruiz-Esquide
                                                 Deputy City Attorneys